**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

PHYLLIS A. HOLLIS,

     Debtor                                         Chapter 7

Case No. 07-22759 (KCF)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THOMAS J. ORR, Trustee and
PHYLLIS A. HOLLIS, individually, debtor,

     Plaintiffs,

          vs.                                Adversary No. 07-2615

AMERIQUEST MORTGAGE COMPANY,
AMERIQUEST MORTGAGE SECURITIES,
INC., DEUTSCHE BANK NATIONAL
TRUST COMPANY, AMC MORTGAGE          **OPINION**
SERVICES, JOHN DOES 1-5,

Hearing Date: June 8, 2009
     Defendants.                              Document Number 51 & 52
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**<u>APPEARANCES:</u>**

Margaret Lambe Jurow, Esquire
LEGAL SERVICES OF NEW JERSEY
100 Metroplex Drive, Suite 402
Edison, New Jersey 08818
Attorneys for Phyllis Hollis, Debtor/Plaintiff

Andrea Dobin, Esquire
STERNS & WEINROTH
50 West State Street, Suite 1400
PO Box 1298
Trenton, New Jersey 08607-1298
Attorney for Thomas J. Orr, Trustee, Co-Plaintiff

Sandhya M. Feltes, Esquire
KAPLAN, STEWART, MELOFF, REITER & STEIN, P.C.
Union Meeting Corporate Center
910 Harvest Drive
Blue Bell, Pennsylvania 19422
Attorney for Defendants

THE HONORABLE KATHRYN C. FERGUSON, U.S.B.J.

On November 19, 2007, Thomas Orr, Esq., the Chapter 7 Trustee, filed a complaint on behalf of the estate and Phyllis A. Hollis, the Debtor, joined as co-plaintiff in her individual capacity.  The four count complaint sought relief for violations of the Truth in Lending Act (First Count); Consumer Fraud (Second Count); Common Law Fraud (Third Count); and Aiding and Abetting Common Law Fraud (Fourth Count).  On May 18, 2009, Plaintiff Phyllis Hollis moved for partial summary judgment on the First Count of the complaint.  Also on May 18, 2009, Defendants Ameriquest Mortgage Company, Deutsche Bank National Trust Company, AMC Mortgage Securities, Inc. and AMC Mortgages Services moved for partial summary judgment on the Second, Third and Fourth Counts of the complaint.  The Defendants also cross-moved for summary judgment on the First Count.  The Court took oral argument on all of these motions on June 8, 2009, and reserved decision.  The Court permitted Plaintiff's counsel to file a supplemental brief to address an issue raised at oral argument.  The following are the Court's findings of fact and conclusions of law.

<u>Factual background</u>

In July 1999, the Debtor and her mother purchased a home located at 38 Hilliard Road, Old Bridge, New Jersey.  To finance the purchase, Ms. Hollis executed a purchase money mortgage in the amount of $145,798 at a fixed rate of interest of 8.875% payable over 30 years (in March 2001 the rate was reduced to 7.25%).  In October 2000, Ms. Hollis took out a second mortgage on the property for the purpose of making home improvements.  The loan was in the amount of $42,300 at a fixed rate of interest of 14.25% payable over 20 years.

In late 2001, Ms. Hollis spoke with an Ameriquest representative regarding refinancing the two existing mortgages.[1]  The parties reached an agreement to refinance and the loan closed in November 2001.  Ameriquest provided Ms. Hollis with an adjustable rate 30 year mortgage at an initial rate of 8.250% with a principal balance of $207,000 with closing costs of approximately $9,300.  For the first three years the November 2001 loan contained a prepayment penalty equivalent to 6 months interest payments.

In early 2006, Ms. Hollis again spoke with an Ameriquest representative regarding refinancing. Ms. Hollis first attempted to enter a refinance with Ameriquest on January 26, 2006, but she immediately rescinded that transaction because she was afraid of another prepayment penalty.  After cancelling the January 2006 transaction, Ms. Hollis decided to go forward with a slightly modified transaction. On February 9, 2006, Ameriquest closed on a residential mortgage refinance of its pre-existing mortgage with Ms. Hollis in the principal amount of $234,000.

In May 2007, "Deutsche Bank National Trust Company, as Trustee of Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificate Series 2006-R2 Under the Pooling and Servicing Agreement Dated as of March 1, 2006, Without Recourse" (hereinafter "Deutsche Bank") filed a foreclosure action in the Superior Court of New Jersey regarding the property at 38 Hilliard Road, Old Bridge, New Jersey.  Ms. Hollis filed this bankruptcy petition on September 6, 2007, staying the foreclosure action.  In her schedules, Ms. Hollis listed causes of action related to predatory lending in connection with the mortgage on her home.  On

---

[1]There is a factual dispute as to which party initiated the contact regarding the refinances, but that factual issue is not material to these motions for partial summary judgment.

4

November 7, 2007, Ms. Hollis attempted to rescind the 2006 Ameriquest Mortgage, which was the subject of the foreclosure action, by sending Notices of Rescission to Ameriquest, AMC Mortgage Services, AMS and Deutsche Bank via regular and certified mail, return receipt requested.  The bankruptcy trustee, Thomas Orr, also notified the Defendants that he rescinded the 2006 loan transaction on behalf of the estate.   The Defendants have not yet taken any steps to remove the 2006 mortgage, nor have they returned any money received or paid to others in connection with the 2006 loan transaction.  On November 17, 2007, the Trustee filed this Complaint.

I.  Standard for summary judgment

Summary judgment is not lightly granted.  The Federal Rules provide that summary judgment should be granted only when the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Fed. R. Civ. Pro.* 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The Third Circuit has stated that whenever there is even the "slightest doubt regarding the facts of a case, summary judgment should not be granted." Tomalewski v. State Farm Life Ins, Co., 494 F.2d 882, 884 (3d Cir. 1984).  Facts must be viewed in the light most favorable to the party against whom summary judgment is sought. Tran v. Metropolitan Life Ins. Co., 408 F.3d 130, 135 (3d Cir. 2005).

That does not mean that summary judgment is never appropriate.  When a party opposes a summary judgment motion, it may not rely on vague allegations or denials.  The pivotal language

5

in the Rule is that the nonmoving party must come forward with "specific facts showing that

there is a **genuine** issue for trial." *Fed. R. Civ. Proc.* 56(e) (emphasis added). "Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986); In re CitX Corp., Inc., 448 F.3d 672 (3d Cir. 2006).

   A. First Count

   The First Count of the complaint alleges that Deutsche Bank, Ameriquest, and AMS

violated the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), with regard to the

February 2006 loan transaction.  Courts have consistently held that TILA should be construed

liberally in favor of borrowers.  *See, e.g.,* Smith v. Fidelity Consumer Discount Co., 898 F.2d

896 (3d Cir. 1990).  TILA is a remedial statute and achieves its remedial goals through a system

of strict liability in favor of consumers when mandated disclosures have not been made. 15

U.S.C. § 1640(a).  Failure to comply with TILA's disclosure requirements renders a lender liable

regardless of the severity of the violation or the good intentions of the lender.  Smith at 898.

"[O]nce the court finds a violation, no matter how technical, it has no discretion with respect to

liability." Id. (*quoting*, Grant v. Imperial Motors, 539 F.2d 506, 510 (5th Cir. 1976)).

   1)  Statutes of limitation

         a) TILA damages claims

   The First Count Defendants assert that any claim for compensatory and statutory

damages under TILA is time-barred.  Plaintiffs fail to address that assertion yet continue to

contend that they are entitled to attorneys fees under § 1640(a)(3).  TILA provides that "[a]ny

6

action under this section may be brought in any United States district court, or in any other court

of competent jurisdiction, within one year from the date of the occurrence of the violation." 15

U.S.C. § 1640(e). The date of the occurrence of the violation in this case would be February 9,

2006 when the loan transaction closed. This adversary proceeding was not commenced until

November 2007, so it was well beyond the one-year statute of limitations for TILA damages

claims.

Although the Plaintiff does not directly address this statute of limitations problem, she

implies that she believes her right to damages under § 1640(a)(3) is preserved because of the

extended time period provided for asserting a right to rescission. That is not the case. The

Supreme Court made clear in Beach v. Ocwen Federal Bank, 523 U.S. 410 (1998) that under

TILA remedies for statutory and actual damages are distinct from the right of rescission provided

by § 1635(f). The former is subject to a one-year statute of limitation and the later to a three-day

or in certain circumstances three-year bar to enforcement. Id. at 411; *see also*, Busse v.

Homebank LLC, 2009 WL 424278, 6 (D.N.J. 2009) ("Unlike a request for rescission, claims for

compensatory and punitive damages under TILA are subject to a one-year statute of

limitations.").

Two other possible avenues would allow the Plaintiffs' damages claims to survive the

one-year statute of limitations. The first would be equitable tolling, which has been held to be

applicable to TILA claims. Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 502 (3d Cir.

1998). Equitable tolling is appropriate where: (1) the defendant actively misleads the plaintiff

respecting the plaintiff's cause of action; (2) the plaintiff in some extraordinary way has been

prevented from asserting his or her rights; or (3) the plaintiff timely asserted his or her rights

mistakenly in the wrong forum. <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1387 (3d Cir. 1994). The Plaintiffs have not alleged any facts that suggest that equitable tolling is appropriate.

The second possible avenue is provided by the statute itself. After establishing the one-year statute of limitations, the statute provides that "[t]his subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law." 15 U.S.C. § 1640(e). Although the Plaintiffs' damages claim has not technically been raised as an affirmative defense of recoupement or set-off, courts have taken a liberal view on that issue. Generally, raising TILA as a recoupement defense occurs in response to a foreclosure action. <i>See, e.g.,</i> <u>Beach v. Ocwen Federal Bank</u>, 523 U.S. 410 (1998). The court in <u>Nix v. Option One Mortg. Corp.</u>, 2006 WL 166451, 3 (D.N.J. 2006) recognized the unique situation that comes into play when a bankruptcy filing truncates a foreclosure matter. The <u>Nix</u> court noted approvingly that some courts view the filing of a proof of claim in bankruptcy as an action brought by a creditor and that an adversary proceeding based on TILA can then be viewed as a recoupement defense to that action. That is precisely what occurred in <u>In re Jones</u>, 122 B.R. 246 (W.D. Pa.1990). In <u>Jones</u>, the debtor filed a proof of secured claim on behalf of the creditor as well as an adversary complaint objecting to the secured claim. The <u>Jones</u> court determined that the creditor's claim and the debtor's TILA claim arose out of the same mortgage transaction, and therefore the TILA claim was in the nature of a defense in that action. This Court concurs with

8

the Jones court's observation that "[t]he congressional policy embodied in TILA is [] fulfilled through the determination that a debtor's TILA claim and a creditor's debt claim arise from the same transaction." Jones at 250. Likewise, "that allowing debtors to raise TILA claims as defenses of recoupment to creditors' proofs of claims is consistent with bankruptcy policy." Jones at 251. Here, as a result of Ms. Hollis' bankruptcy filing the foreclosure action was stayed and the property sold by the Trustee, thereby preventing the Debtor from raising recoupement of TILA damages as an affirmative defense to the foreclosure action. It would be equitable, therefore, to view the Plaintiffs' damages claim in this adversary proceeding as an affirmative defense to Ameriquest's proof of claim. Accordingly, the Court finds that the Plaintiffs' claim for damages is not time-barred.

b) TILA right to rescission

In addition to providing a right to damages, TILA also permits a borrower whose loan is secured with a "principal dwelling" to rescind the loan transaction entirely until "midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section with a statement containing the material disclosures required under this subchapter, whichever is later." 15 U.S.C. § 1635(a). If the lender fails to provide or deliver the appropriate forms and disclosures, however, the obligor's right of rescission will extend for three years after consummation of the transaction. 15 U.S.C. § 1635(f).

The Defendants argue that the Plaintiffs' TILA rescission remedy is barred by the Plaintiffs' failure to rescind within three business days of the loan closing. A determination of Whether the Plaintiffs are bound by the three-day rescission period or the three-year rescission

period turns on a determination of whether the material disclosures were accurate.

2) Accuracy of TILA disclosures

TILA requires the lender or creditor to make certain disclosures to consumers. 15 U.S.C. §1631(a). In implementing the Truth In Lending Act, Congress authorized the Federal Reserve Board to promulgate regulations concerning the implementation of the statute including the particulars of the disclosures. 12 C.F.R. 226.4. The implementing regulations are commonly known as Regulation Z.  Jeffries v. Ameriquest Mtg. Co., 543 F. Supp. 2d 368, 379 (E.D. Pa. 2008).  Certain of the required TILA disclosures are deemed "material disclosures," including the finance charge. 15 U.S.C. §1602(u).   TILA defines a finance charge as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit" 15 U.S.C. §1605(a). Regulation Z defines a finance charge as "the cost of consumer credit as a dollar amount," which "includes any charge payable directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. §226.4.  If a material disclosure is not made or is made inaccurately, the consumer may be entitled to rescission of the loan.

The Plaintiff asserts that the material disclosures with regard to the 2006 loan transaction were inaccurate because the finance charge was not correctly stated.  The Plaintiff takes issue with two aspects of the finance charge: the recording fees and retained unearned interest.  The Court notes that these issues have been a moving target to say the least.  The elements that the Defendants claim compose the recording fee morphed from their first set of papers to their last and then changed again at oral argument.  On the Plaintiffs' side, their request for relief changed from seeking total rescission of the entire February 2006 mortgage to seeking to return Ms.

10

Hollis to the position she was in on February 9, 2006 just prior to the transaction[2].

The Court will first examine the recording fee. The HUD-1 settlement form issued in connection with the 2006 loan transaction listed a $280 recording fee to New Vision Title Agency. Normally, such recording fees do not have to be disclosed as part of the finance charge. Among the items exempted from computation of a finance charge are "[f]ees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction." 15 U.S.C. § 1605(d)(1). The Plaintiff objected to the failure to disclose the $280 recording fee on the grounds that only $210 of the fee, the portion paid to the Middlesex County Clerk to record the 2006 mortgage, fell under the § 1605(d)(1) exclusion. Therefore, the remaining $70 should have been disclosed to Ms. Hollis as part of the finance charge in the TILA Disclosure Statement. Congress has provided lenders with some leeway in these matters but the allowable margin for error is only $35 and thus this non-disclosure falls outside the tolerance level. *See*, 15 U.S.C. § 1635(i)(2); Reg. Z § 226.23(h)(2).

The Defendants responded by arguing that there were actually two recording fees and not just one. Defendants maintain that in addition to the $210 paid to record the 2006 mortgage,

---

[2]The Court finds this particularly disturbing because the allegation that full rescission is not available in same lender refinances by virtue of 12 C.F.R. § 226.23(f)(2) was raised by the Defendants in the August 2008 summary judgment motion. While the Court's summary judgment ruling did not turn on that issue, the Plaintiffs at the very least should have addressed it in this motion for summary judgment before seeking full rescission as a remedy. The Third Circuit has recognized that the "right to rescind does not apply to a 'refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer's principal dwelling. 12 C.F.R. § 226.23(f)(2).'" In re Porter, 961 F.2d 1066, 1075 (3d Cir. 1992).

they also paid $50 to the Middlesex County Clerk to record a discharge of the 2001 mortgage

lien.  The two fees total $260 and thus makes their non-disclosure only $20.  Since $20 is within

the TILA tolerance for accuracy, the Defendants argue that the disclosed finance charge is

accurate.

      The Plaintiff points out that the Defendants' arithmetic is still incorrect because they

double count $40 of the mortgage discharge recording fee in their analysis.  The Gibson

certification indicates on the first line of the second page that $40 was included in the payoff

disbursement receipts in connection with the 2001 loan.  Therefore, it cannot be double counted

as part of the $50 mortgage discharge recording fee.  Based on that, the Defendants are once

again outside the tolerance zone for inaccuracy.

      In the Defendants' final reply brief, they argue that no portion of the $280 recording fee

charged by New Vision Title Agency should have been disclosed to Ms. Hollis by virtue of §

1605(d)(1) and § 1605(a).  As previously discussed, finance charge disclosures do not have to

include amounts actually paid to public officials to record or discharge a mortgage.  *See*, 15

U.S.C. § 1605(d)(1).  Section 1605(a) also exempts from a finance charge disclosure "fees and

amounts imposed by third party closing agents (including settlement agents, attorneys, and

escrow and title companies) if the creditor does not require the imposition of the charges or the

services provided and does not retain the charges."  15 U.S.C. § 1605(a).

      At oral argument, the Defendants introduced two new fees to justify their non-disclosure.

Defendants calculations at oral argument were as follows:

recording fees paid to Ameriquest     $40
recording fees paid to New Vision     $280
Total recording fees                          $320

| recording fee for 2006 mortgage | $210 |
| service charge for recording of instrument | $5  [in accordance with § 7.1(a) of Rate Manual] |
| recording of satisfaction of 2001 mortgage | $50 |
| service charge ($75 - $50 = $25) | $25 [in accordance with § 7.1(b) of Rate Manual] |
| Total allowable fees | $290 |

$320 - $290 = $30 improperly undisclosed fees  [within the TILA tolerance of $35 per § 1635(i)]

Both sides agree that the $210 and $50 actually paid to the Middlesex County Clerk for recordation of documents is legitimately excluded from disclosure as a finance charge by virtue of § 1605(d)(1).  A question still arises with regard to the $5 and $25 closing agent fees.  Despite the Defendants arithmetic sleight of hand, those fees cannot be considered to be properly excluded. These fees are not actually paid to a public official so they cannot be excluded by operation of § 1605(d)(1).  They also cannot be excluded from the finance charge by operation of § 1605(a).  That section only exempts fees paid to third party settlement agents, such as New Vision Title Agency, "if the creditor does not require the imposition of the charges or the services provided and does not retain the charges."  15 U.S.C. § 1605(a).  Based on the letter of Michael Alfieri of New Vision Title Agency, the contested $30 in fees were not retained by Defendant Ameriquest.  *Ameriquest Reply Brief;* Ex. K[3].  That is only half equation.  To satisfy § 1605(a) the fees may not have been imposed by the creditor or been for services required by the creditor.  It cannot reasonably be argued that the recording of the mortgage and the satisfaction of the previous mortgage were not services that Ameriquest required of its title agent.  As a result, those fees, although acceptable under the Rate Manual, do not satisfy the requirements for exclusion under § 1605(a).  As a result, the Court finds that the TILA

---

[3]The Court has admissibility concerns regarding this exhibit but since it is not outcome-determinative the Court will rely on the factual statements contained in Mr. Alfieri's letter for the purposes of this analysis.

disclosures provided to Ms. Hollis in connection with her 2006 loan transaction were not

accurate.  If the $30 in improperly omitted fees are added back in, the actual discrepancy is $60.

A $60 inaccuracy may seem inconsequential in a transaction of this size, but TILA is a strict

liability statute and "once the court finds a violation, no matter how technical, it has no

discretion with respect to liability." <u>Smith v. Fidelity Consumer Discount Co.</u>, 898 F.2d 896, 898

(3d Cir. 1990) (internal citation omitted).  Given the Court's finding that the TILA disclosures

provided to Ms. Hollis in connection with her February 2006 loan transaction were inaccurate

with regard to the recording fees, the Court does not need to address the additional allegation

that the disclosures were inaccurate due to the failure to disclose unearned interest.

     3) Right of rescission

     As previously stated, if a lender fails to provide appropriate disclosures, the obligor's

right of rescission will extend for three years after consummation of the transaction. 15 U.S.C. §

1635(f).  This transaction was consummated in February 2006 and the requests for rescission,

including this adversary complaint, were made in November 2007; they are within that three

year period and are therefore timely.

     The parties disagree as to parameters of the right of rescission in this case.  TILA

provides that:

> When an obligor exercises his right to rescind under subsection (a) of this section,
> he is not liable for any finance or other charge, and any security interest given by
> the obligor, including any such interest arising by operation of law, becomes void
> upon such a rescission. Within 20 days after receipt of a notice of rescission, the
> creditor shall return to the obligor any money or property given as earnest money,
> downpayment, or otherwise, and shall take any action necessary or appropriate to
> reflect the termination of any security interest created under the transaction. If the
> creditor has delivered any property to the obligor, the obligor may retain
> possession of it. Upon the performance of the creditor's obligations under this
> section, the obligor shall tender the property to the creditor, except that if return

14

of the property in kind would be impracticable or inequitable, the obligor shall
tender its reasonable value. Tender shall be made at the location of the property or
at the residence of the obligor, at the option of the obligor. If the creditor does not
take possession of the property within 20 days after tender by the obligor,
ownership of the property vests in the obligor without obligation on his part to
pay for it. The procedures prescribed by this subsection shall apply except when
otherwise ordered by a court.

15 U.S.C. § 1635(b); *see also*, 12 C.F.R. § 226.23(d).  Based on that, the Plaintiffs' original

prayer for relief included: voiding the Defendants' security interest in the proceeds of the sale of

38 Hilliard Road; requiring the Defendants to refund to the estate a total of $37,977.01

consisting of the $13,176.30 in settlement charges together with the interest of $17,246.62,

$1,500.00 to the suspense account, $1,670.09 in late fees and $4,384.00 of corporate advances;

and modifying Deutsche Bank's claim to an unsecured claim for $234,000.00.  In addition, the

Plaintiffs requested attorneys fees and costs of suit, and for the court to set a schedule for

determining the amount of the statutory fee award for Plaintiffs' counsel.

Defendants countered that even if Plaintiffs were successful in their TILA claim,

Plaintiffs do not have the right to rescind the entire security interest in the property.  The

Defendants are correct.  TILA expressly exempts from a borrower's right to rescind a mortgage

transaction that refinances a prior loan by the same lender:

> (f) Exempt transactions. The right to rescind does not apply to the
> following…
>     (2) A refinancing or consolidation by the same creditor of
> an extension of credit already secured by the consumer's principal
> dwelling. The right of rescission **shall apply**, however, to the
> extent the new amount financed exceeds the unpaid principal
> balance, any earned unpaid finance charge on the existing debt,
> and amounts attributed solely to the costs of the refinancing or
> consolidation.

Regulation Z § 226.23(f)(2) (emphasis added); 15 U.S.C. 1635(e).  Based on that language , the

15

Defendants conclude that the maximum amount of the loan that is available for rescission is

$14,989.31, which is the amount of new money advanced.  The Defendants' reading of

Regulation Z § 226.23(f)(2) is not consistent with the official commentary.  *See*, Household

Credit Services, Inc. v. Pfennig, 541 U.S. 232 (2004) (The official staff commentary to TILA is

entitled to deference from the courts).  The Official Staff Interpretation of § 226.23(f)(2) states

that:

> if new advances of money are made (for example, to pay for home improvements)
> and the consumer exercises the right of rescission, the consumer must be placed
> in the same position as he or she was in prior to entering into the new credit
> transaction.  Thus, all amounts of money (which would include all the costs of
> refinancing) already paid by the consumer to the creditor or to a third party as part
> of the refinancing would have to be refunded to the consumer.

12 C.F.R. Pt. 226, Supp. I at 580 (rev. Jan. 1, 2009).  The Supreme Court has instructed that

"[u]nless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or

Regulation should be dispositive ...."  Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565

(1980).  The Court finds the foregoing interpretation of § 226.23(f)(2) to be rational given the

wording of the statute and therefore will consider it dispositive on this issue.  Accordingly, the

Court finds that Ms. Hollis would be entitled to a refund of the $14,989.31 new advance amount

as well as any amounts paid by her as part of the refinancing.

Unsurprisingly, the parties disagree as to what that would entail.  Ms. Hollis requests that

the Court order the Defendants to refund to the estate a total of $37,977.01 consisting of: 1)

$13,176.30 in settlement charges; 2) $17,246.62 in interest; 3) $1,500 held in the suspense

account; 4) $1,670.09 in late fees, and 5) $4,384 in corporate advances.  The Defendants contend

that at most Ms. Hollis would be entitled to a return of the settlement charges and interest, but

that nothing in TILA allows for the return of money in the borrower's suspense account, late fees

16

or corporate advances[4].  Again, the Court finds that the Defendants position is inconsistent with the official commentary to TILA.  The commentary clarifies that once it has been determined that there was a new advance, as is the case here, then the borrower is entitled to a return of "all amounts of money (which would include all the costs of refinancing) already paid by the consumer to the creditor or to a third party as part of the refinancing would have to be refunded to the consumer.  (See the commentary to § 226.23(d)(2) for a discussion of refunds to consumers.)"  12 C.F.R. Pt. 226, Supp. I at 580 (rev. Jan. 1, 2009).   The commentary to § 226.23(d)(2) further clarifies that "[t]he consumer cannot be required to pay any amount in the form of money or property either to the creditor or to a third party as part of the credit transaction.  Any amounts of this nature already paid by the consumer must be refunded."  12 C.F.R. Pt. 226, Supp I at 579.

The key question is whether the contested amounts were paid by Ms. Hollis as part of the refinancing.  If the answer is "yes," then they must be returned to her.  The Court does not have enough information about the nature of items 3 - 5 to make that determination.  The Defendants contend that the corporate advances represent real estate taxes and hazard insurance paid by the lender on the borrowers' behalf.  If that is true, then the $4,384 in corporate advances would not have to be refunded because it is not an amount paid by the consumer.  The late fees and amount in the suspense account appear to be amounts paid by the consumer.  The question remains whether those amounts were paid as part of the refinancing.   Therefore, the Court must deny

---

[4]The Defendants contend that they would be entitled to an offset in the amount of $14,989.31 for the actual benefit that Ms. Hollis received from Ameriquest's payment of her debts.  The legal basis for that relief is not stated and it appears to be beyond the parameters of either the motion or cross-motion for summary judgment on the First Count.

summary judgment on the narrow issue of whether the amounts requested by Ms. Hollis in items 3- 5 must be refunded.  Summary judgment is granted in her favor on the issue of the return of the new money portion of the refinance as well as items 1 and 2.  A determination of the proper amount of Deutsche Bank's secured claim will have to abide a decision on the remaining counts of the complaint.

B.  <u>Second, Third and Fourth Counts</u>

Defendants move for partial summary judgment on the Second, Third and Fourth counts of the Complaint.  Those counts assert claims based on state law, including the New Jersey Consumer Fraud Act and common law fraud.  Defendants assert that the causes of action fail as a matter of law because they are preempted by the National Bank Act and/or the Truth in Lending Act.

1) Federal Preemption

The United States Supreme Court has recently reaffirmed the principle that there is a presumption against preemption.  <u>Wyeth v. Levine</u>, – U.S. –, 129 S. Ct. 1187, 1194-95 (2009). In <u>Wyeth</u>, the Court also reviewed the cornerstone of its pre-emption jurisprudence.  First, that Congressional purpose "is the ultimate touchstone in every pre-emption case," and second, that federal law is not to be found to preempt state law "unless that was the clear and manifest purpose of Congress. " <u>Id.</u> (internal citations omitted).  There are only three situations in which the Supreme Court has found preemption: 1) when a federal statute commanded it, *see, e.g.*, <u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504 (1992); 2) when a conflict between federal and state law precluded obedience to both sovereigns, *see, e.g.*, <u>Florida Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. 132 (1963); or 3) when a federal statute so completely occupied a field that

18

it left no room for additional state regulation, *see, e.g.,* Napier v. Atlantic Coast Line R. Co., 272

U.S. 605 (1926).   The Third Circuit has recently noted the strong presumption against

preemption that runs through Supreme Court jurisprudence.  Holk v. Snapple Beverage Corp., –

F.3d –, 2009 WL 2449561 (3d Cir. Aug 12, 2009).

### a) National Bank Act

Defendants assert that Defendant Deutsche Bank is a national bank and therefore is not

subject to New Jersey laws with regard to its banking activities.   Defendants argue that the sole

authority governing Deutsche Bank is the National Bank Act, 12 U.S.C. § 21, *et seq.*, and the

regulations promulgated thereunder by the Office of the Comptroller of Currency.

In support of its position, the Defendants rely extensively on Watters v. Wachovia Bank,

N.A., 550 U.S. 1 (2007).  The Defendants quote the following language from Watters:

> In the years since the NBA's enactment, we have repeatedly made clear that
> federal control shields national banking from unduly burdensome and duplicative
> state regulation . . . the States can exercise no control over [national banks], nor in
> any wise affect their operation, except in so far as Congress may see proper to
> permit. Any thing beyond this is an abuse, because it is the usurpation of power
> with [sic] a single State cannot give.

*Defendants' Brief* at 11-12 (quoting Watters at 1566-67).  Interestingly, the Defendants chose to

omit the following:

> Federally chartered banks are subject to state laws of general application in their
> daily business to the extent such laws do not conflict with the letter or the general
> purposes of the NBA.  For example, state usury laws govern the maximum rate of
> interest national banks can charge on loans, contracts made by national banks "are
> governed and construed by State laws,", and national banks' "acquisition and
> transfer of property [are] based on State law,"

Watters at 1566-67 (internal citations omitted).   This Court fully endorses the proposition that

state law must not impede federally chartered banks from engaging in their enumerated or

incidental powers.  What the Defendants have failed to establish is that the state law at issue here

conflicts "with the letter or the general purposes of the NBA."  Id.  The Court perceives no

meaningful distinction between federal banks being subject to state usury law and federal banks

being subject to state fraud law.  This important point was eloquently expressed by the dissent in

Watters:

> This Court has consistently recognized that because federal law is generally
> interstitial, national banks must comply with most of the same rules as their state
> counterparts. As early as 1870, we articulated the principle that has remained the
> lodestar of our jurisprudence: that national banks
>> "are only exempted from State legislation, so far as that legislation may interfere
>> with, or impair   their efficiency in performing the functions by which they are
>> designed to serve that government....They are subject to the laws of the State, and
>> are governed in their daily course of business far more by the laws of the State
>> than of the nation. All their contracts are governed and construed by State laws.
>> Their acquisition and transfer of property, their right to collect their debts, and
>> their liability to be sued for debts, are all based on State law. It is only when the
>> State law incapacitates the banks from discharging their duties to the government
>> that it becomes unconstitutional." National Bank v. Commonwealth, 9 Wall. 353,
>> 362, 19 L.Ed. 701 (1870).

Watters at 24 (J. Stevens, dissenting); see also, McClellan v. Chipman, 164 U.S. 347, 357 (1896)

(explaining that Supreme Court cases establish "a rule and an exception, the rule being the

operation of general state laws upon the dealings and contracts of national banks, the exception

being the cessation of the operation of such laws whenever they expressly conflict with the laws

of the United States or frustrate the purpose for which the national banks were created, or impair

their efficiency to discharge the duties imposed upon them by the law of the United States").

The Defendants have utterly failed to establish that the state law at issue here incapacitates

Deutsche Bank from discharging its duties[5].  It is beyond cavil that engaging in fraudulent

---

[5]The Court is open to the possibility that there may be discrete provisions in New
Jersey's Consumer Fraud Act that despite their general nature might in their application run

lending practices is not an express or incidental power granted to federal banks.  *See*, In re

Ocwen Servicing, LLC Mortgage Servicing Litigation, 491 F.3d 638 (7th Cir. 2007) ("it would be

surprising for a federal regulation to bar a suit for fraud".)

Despite the Supreme Court's clear statements that federal banks are subject to state law

to the extent those laws do not interfere with their functioning, the Defendants contend that this

Court must find preemption because the "National Bank Act occupies the entire field of real

estate lending ...."  *Defendants' Reply Brief* at 6.  Field preemption occurs when state law

occupies a field reserved for federal regulation," leaving no room for state regulation. United

States v. Locke, 529 U.S. 89, 111 (2000). It may also be inferred when "an Act of Congress

'touch[es] a field in which the federal interest is so dominant that the federal system will be

assumed to preclude enforcement of state laws on the same subject.' " English v. Gen. Elec. Co.,

496 U.S. 72, 79 (1990).  Nonetheless, for field preemption to be applicable, "congressional intent

to supersede state laws must be 'clear and manifest.' " Id.

Here, the congressional intent that is clear and manifest is that the NBA does not preempt

all state law.  The OCC regulations provide that:

> State laws on the following subjects are not inconsistent with the real estate
> lending powers of national banks and apply to national banks to the extent that
> they only incidentally affect the exercise of national banks' real estate lending
> powers:
> (1) Contracts;
> (2) Torts;
> (3) Criminal law;
> (4) Homestead laws specified in 12 U.S.C. 1462a(f);
> (5) Rights to collect debts;
> (6) Acquisition and transfer of real property;

---

afoul of the NBA, but the Defendants have not specifically highlighted any such provisions for
the Court.

(7) Taxation;
(8) Zoning; and
(9) Any other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a).

12 C.F.R. § 34.4(b).  New Jersey's Consumer Fraud Act and common law fraud law are not "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers."  12 C.F.R. § 34.4(a).  National banks can and should conduct their full panalopy of powers without engaging in fraudulent activity. Therefore, the Court does not find that field preemption is applicable here.

The Court cannot find, particularly in light of the strong presumption against federal preemption, that the National Bank Act or OCC regulations preeempt New Jersey fraud law under an express, conflict, or field preemption theory.  Given this ruling, the Court need not address the Plaintiffs' contention that Deutsche Bank has not properly established that it is a national bank.

### b) TILA Assignee Liability

Defendants alternatively argue that the state law claims against Deutshe Bank are preempted by TILA's assignee liability provisions.  TILA provides that "any civil action against a creditor for a violation ... with respect to a consumer credit transaction secured by real property may be maintained against any assignee of such creditor only if-- (A) the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement provided in connection with such transaction pursuant to this subchapter; and (B) the assignment to the assignee was voluntary."  15 U.S.C. § 1641(e).  This Court need not reach the question of whether TILA's limits on assignee liability relate only to disclosure or if it extends to any claims

22

against an assignee because the Plaintiffs contend that they have direct claims against Deutsche

Bank.  On a motion for summary judgment the court must view the facts in the light most

favorable to the party against whom summary judgment is sought.  Tran v. Metropolitan Life Ins.

Co., 408 F.3d 130, 135 (3d Cir. 2005).  Therefore, assuming there is a valid factual predicate to a

direct claim against Deutche Bank the question becomes whether such a claim legally

sustainable.

The Appellate Division of the New Jersey Superior Court faced that issue in Jefferson

Loan v. Session, 397 N.J. Super. 520 (App. Div. 2008) and concluded that an assignee is liable

for its own direct and active unconscionable commercial practices.  Similarly, in Psensky v.

American Honda Finance, 378 N.J. Super. 221 (App. Div. 2005) the court noted that "when the

assignee directly participates in the fraud, there is [] no TILA bar to assignee liability ...

Congress did not intend to immunize any assignee who actively participates in the wrong."  Id. at

295.  The court in Pensky emphasized that TILA's limitation on assignee liability pertained only

in failure to disclose situations and "that the TILA does not provide complete immunization for

assignees from Consumer Fraud or other state claims. Assignees are immunized only when New

Jersey law is inconsistent with the TILA.   As we have explained above, a plaintiff would also be

entitled to maintain a cause of action under the Consumer Fraud Act, for example, where the

assignee's fraud was active and direct."  Id. at 296. (internal citations omitted).

Accordingly, the Court finds that Deutsche Bank is not entitled to summary judgment on

the basis of TILA's assignee limitation provisions.

### c) TILA preempts state law claims against all defendants

Defendants also argue that the state law claims against all the defendants are expressly

preempted by TILA.  It is unclear from the Defendants' brief if they are arguing that express

preemption applies here or field preeemption.  It is ultimately immaterial because the Court

cannot find preemption under either theory.

A federal law expressly preempts state law if it contains language so requiring.  Lorillard

Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001).  Thus, when assessing a claim of express

preemption, the examining court must look to the plain language of the statute as this

"necessarily contains the best evidence of Congress' pre-emptive intent." Sprietsma v. Mercury

Marine, 537 U.S. 51, 62-63 (2002).   As the Third Circuit recently explained, this examination is

guided by two principles: first, "Congressional purpose is the 'ultimate touchstone' of our

inquiry," and second, courts must operate under the "assumption that the historic police powers

of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest

purpose of Congress."  Bruesewitz v. Wyeth Inc., 561 F.3d 233, 239 (3d Cir. 2009) (internal

citations omitted).

When those principles are applied here, the exact opposite of express preemption

emerges.  Congress' express statement as to whether TILA was intended to preempt related state

laws was:

> [T]his subchapter [does] not annul, alter or affect the laws of any State relating to
> the disclosure of information in connection with credit transactions, except to the
> extent that those laws are inconsistent with provisions of this subchapter and then
> only to the extent of the inconsistency.

15 U.S.C. § 1610(a)(1); *see also*, Regulation Z, 12 C.F.R. § 226.28(a)(1). This language clearly

indicates that Congress only intended to preempt state laws that conflict with provisions of

TILA. *See*, Morales v. Trans World Airlines, Inc., 504 U.S. 374, 386-87 (1992).

Defendants reason that the state laws at issue here conflict with provisions of TILA

24

because they provide remedies that differ from those provided in TILA.  While supplemental

remedies certainly can run afoul of federal law in a preempted field, the Defendants' argument

assumes that fraud is a field preempted by TILA.  The Defendants are far from establishing that

proposition.  Since TILA expressly leaves intact even state disclosure of information laws that

are not inconsistent with its provisions, it is implausible to argue that state fraud and consumer

protection laws are expressly preempted.

Defendants concede that the Plaintiffs' fraud claims do not impose any additional

requirements on the Defendants' lending activities, but argue that they "provide state remedies

for violations of federal law in a field preempted entirely by federal law."  *Defendants' brief* at

22 [Doc. # 52].   That is a perplexing argument in the face of the language of 15 U.S.C. §

1610(a)(1), which explicitly provides for only limited preemption.  The Court must concur with

the courts that have found "that the TILA was not meant to preempt the field of laws relating to

consumer lending practices." Alexiou v. Brad Benson Mitsubishi, 127 F. Supp. 2d 557, 560

(D.N.J. 2000); *see also,* Mason v. General Finance Corp. of Va., 542 F.2d 1226, 1230 (4th Cir.

1976) (indicating that "Congress clearly did not preempt the field" in enacting TILA); *accord*,

Busse v. Homebank LLC, 2009 WL 424278 (D.N.J. Feb. 18, 2009) (denying motion to dismiss

complaint that contained counts under both TILA and the NJ Consumer Fraud Act).

Finally, at oral argument the Defendants' counsel argued that Carmen v. Metrocities

Mortgage Corp., 2009 WL 1416038 (D.N.J. May 18, 2009) supported its position regarding

TILA preemption.  That is not the case.  In fact, the Carmen opinion did not address the issue of

preemption at all.

Accordingly, the Court rejects this alternative argument for finding that the Second

through Fourth Counts must be dismissed.

<u>Conclusion</u>

Plaintiff's motion for summary judgment on the First Count of the Complaint is granted in part and denied in part. Defendants' cross-motion for summary judgment on the First Count of the Complaint is denied. Defendants' motion for summary judgment on the Second through Fourth Counts of the Complaint is denied. Plaintiff's counsel should submit a form of order in accordance with this opinion.

*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated: September 17, 2009

26